66 F.3d 337
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mark Steven VERDUGO, Defendant-Appellant.
 No. 94-50140.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 8, 1995.
Decided Sept. 1, 1995.
 
 MEMORANDUM*
 Before: BROWNING, D.W. NELSON, and HAWKINS, Circuit Judges.
 
 
 1
 Appellant Mark Steven Verdugo ("Verdugo") appeals his sentence for conspiracy to evade payment of customs duties in violation of 18 U.S.C. Secs. 351 and 1001. Specifically, he argues that the district court committed the following errors in sentencing him: (1) it concluded that it could not grant a downward departure for his rehabilitation from alcoholism; (2) it applied the 1992 version of the Sentencing Guidelines rather than the 1987 version; (3) it miscalculated the amount of loss caused by the conspiracy; (4) it held him responsible for the entire amount of that loss; and (5) it refused to grant him a downward adjustment based on his minimal role in the conspiracy. Verdugo also appeals the district court's denial of his motions (1) to dismiss the indictment because of outrageous governmental conduct, and (2) to require recusal of the U.S. Attorney's Office for the Central District of California.
 
 
 2
 We have jurisdiction over this matter pursuant to 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a). Verdugo's challenges to the district court's rulings on the motions to dismiss and to recuse are without merit. Similarly, with one exception, his arguments that the court committed errors in his sentencing are not supported by the record. The record, however, does suggest that there may have been some confusion as to whether the 1987 or the 1992 version of the Sentencing Guidelines applied. We affirm the district court in all other respects, but reverse Verdugo's sentence and remand the matter to the district court to apply the version of the Guidelines it finds most appropriate.
 
 FACTS
 1. The Indictment
 
 3
 Verdugo, a customs inspector, was indicted by a grand jury for allegedly conspiring to evade the payment of customs duties owed by co-defendants Le Chois, Inc. and Esni, Inc., two California corporations engaged in importing women's clothing from Taiwan.[1] The indictment also charged Verdugo with accepting a $5,000.00 bribe in return for signing and/or initialing customs forms without proper entry documentation and without inspecting the imported goods.
 
 2. The Pretrial Motions
 
 4
 Co-defendant Edward Talamantes was the U.S. Attorney's Office's key witness in its case against Verdugo. Talamantes had worked with Verdugo as a customs inspector. He approached Verdugo about joining the conspiracy and he apparently acted as the liaison between Verdugo and the other defendants.
 
 
 5
 In 1983, while still employed as a customs inspector, Talamantes was involved in two instances of inappropriate off-duty conduct. A May 4, 1983 memorandum prepared by the U.S. Customs Service indicated that Robert Brosio, the Chief of the Criminal Division of the U.S. Attorney's Office for the Central District of California, had reviewed the files on these incidents, had discussed them with then-U.S. Attorney Stephen Trott, and had advised the Customs Service that Talamantes' credibility had been so damaged by his conduct that he could no longer "act as a Government witness in any future criminal proceedings in the Central District of California."
 
 
 6
 Relying on this memorandum, Verdugo moved to dismiss the indictment on the basis of outrageous governmental conduct. He also joined co-defendant Feldman's motion to recuse the U.S. Attorney's Office from prosecuting the case. Verdugo argued in his motion to dismiss that the U.S. Attorney's Office's decision to call Talamantes as a witness amounted to outrageous governmental conduct because the office had decided ten years earlier that it would no longer use Talamantes as a witness in criminal cases. The district court denied Verdugo's motion.
 
 
 7
 The motion to recuse argued that the district court should bar the U.S. Attorney's Office from prosecuting the case because, if Talamantes were called as a witness, the defense would call Brosio (the Assistant U.S. Attorney who reviewed the Talamantes file in 1983) to impeach Talamantes' credibility. Because Brosio was from the same office that was prosecuting the case (although he did not participate in Verdugo's case), the defense argued that the entire office should be recused. The court denied the motion.
 
 3. The Conviction and Sentence
 
 8
 After a three day bench trial, the court convicted Verdugo of the conspiracy charge, but acquitted him on the charge of accepting a bribe. The Presentence Report concluded that, for his conspiracy conviction, Verdugo was eligible for a sentence of 37 to 46 months based on an adjusted offense level of 21. At the sentencing hearing, the district court gave Verdugo a three point offense level reduction for acceptance of responsibility, bringing his adjusted offense level to 18, with a sentencing range of 27 to 33 months. The district judge told Verdugo that, if he were not constrained by the Guidelines, he would sentence Verdugo to less than 27 months. Because he was obliged to follow the Guidelines, however, he sentenced Verdugo to 27 months imprisonment.
 
 DISCUSSION
 I. VERDUGO'S MOTIONS
 A. Motion to Dismiss
 
 9
 This Court reviews de novo a district court's denial of motion to dismiss an indictment for outrageous governmental conduct. United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991). An independent review of the facts presented by Verdugo's motion to dismiss reveals that the district court properly denied the motion.
 
 
 10
 The outrageous governmental conduct defense is a "most narrow one." United States v. Stenberg, 803 F.2d 422, 429 (9th Cir.1986) (quoting United States v. Ryan, 548 F.2d 782, 789 (9th Cir.), cert. denied, 429 U.S. 939 (1976) and 430 U.S. 965 (1977)). It is only available when "the government is so involved in the criminal endeavor that it shocks our sense of justice." Id. (quoting United States v. So, 755 F.2d 1350, 1353 (9th Cir.1985)). Examples of outrageous governmental conduct include situations where law enforcement agents employ unwarranted physical or mental coercion, where government agents engineer and direct the criminal enterprise from start to finish, or where the government manufactures a crime to obtain the defendant's conviction. Stenberg, 803 F.2d at 429.
 
 
 11
 Here, the "outrageous conduct" of which the government is accused is using Talamantes as a witness in a case in which he was a co-defendant, despite the fact that the government had decided ten years earlier that it would not call Inspector Talamantes as a witness in any criminal case initiated by the U.S. Attorney's Office for the Central District of California. The distinction between Talamantes' role as a testifying co-defendant and his role as government representative called to testify at a criminal trial is clear. The U.S. Attorney's Office's decision to call Talamantes to testify against Verdugo simply does not rise to the level of "outrageous conduct," as such conduct has been defined by this Court. The district court properly denied Verdugo's motion to dismiss.
 
 B. Motion to Recuse
 
 12
 Verdugo sought to have the entire U.S. Attorney's Office recused pursuant to the advocate-witness rule, which "prohibits an attorney from appearing as both a witness and an advocate in the same litigation." United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir.1985). The motion to recuse was premised on the defense's assertion that, if Talamantes testified, the defense would call Assistant U.S. Attorney Robert Brosio to testify about the 1983 decision not to use then-Customs Agent Talamantes as a witness in criminal cases. Because Brosio was from the same office of the U.S. Attorney's Office involved in this case, Verdugo and his co-defendants argued that the advocate-witness rule precluded the entire office from prosecuting the case.
 
 
 13
 The district court denied the motion. We review a district court's denial of a motion for recusal for abuse of discretion. Id. at 552; United States v. Gordon, 974 F.2d 1110, 1114 (9th Cir.1992).
 
 
 14
 The lower court did not abuse its discretion in denying the motion. Brosio's participation as a witness in Verdugo's trial would not have required recusal of the entire U.S. Attorney's Office. As we noted in United States v. West, "although testimony by a United States Attorney should not be encouraged, such persons are not disqualified as witnesses in cases in which they play no other role." 680 F.2d 652, 654 (9th Cir.1982) (citing United States v. Armedo-Sarmiento, 545 F.2d 785, 793 (2d Cir.1976), cert. denied, 430 U.S. 917 (1977)). Thus, in West the court held that the district court did not abuse its discretion in permitting the prosecutor to call a non-participating Assistant U.S. Attorney as a witness. Id. at 655.
 
 
 15
 Although West does not involve recusal, it does illustrate the parameters within which a non-participating Assistant U.S. Attorney may testify at a criminal trial. If the trial court in West did not abuse its discretion in permitting the prosecutor to call another attorney from her office to testify, the district court in this case most certainly did not abuse its discretion in refusing to recuse the entire U.S. Attorney's Office because the defense suggested that it might call a non-participating Assistant U.S. Attorney to the stand.
 
 II. SENTENCING ISSUES
 
 16
 This Court applies a de novo review when determining the legality of a sentence. United States v. Fine, 975 F.2d 596, 599 (9th Cir.1992). It accepts the district court's findings of fact unless they are clearly erroneous, and gives due deference to the lower court's application of the guidelines to the facts. Id.
 
 
 17
 A. Possible Improper Use of the 1992 Sentencing Guidelines
 
 
 18
 Verdugo's Presentence Report relied upon the November 1, 1992 version of the Guidelines. However, the report states:
 
 
 19
 According to the Government, the evidence adduced at trial indicated that Verdugo continued in the conspiracy through the end of 1989 and early 1990.... In fairness to the defendant, however, it is noted that the Indictment references his last act as occurring August 30, 1988. If his actions had ended on that date, it could limit the Guidelines to those effective November 1, 1987. This would reduce the Total Offense Level....[2]
 
 
 20
 Verdugo argues that confusion exists on the record as to whether the district court, relying on the above excerpt from the Presentence Report, intended to apply the 1987 Guidelines. Verdugo's argument is based on the following colloquy between the court and defense counsel at his sentencing hearing:
 
 
 21
 DEFENSE COUNSEL: And in this instance we have a long going conspiracy, which the Court is well aware of, where Mr. Verdugo comes in under the prosecution's theory and what the Court found him guilty of, under a very small ancillary part of the continuing scheme and is never heard from again. And yet the presentence report would seek to charge him with the totality of the conspiracy as far as what his imprisonment liability should be.
 
 
 22
 COURT: Let's just take a look at page 13 of the presentence report, for example, at paragraph 50 in this paragraph the last sentence it says--well, just before that, second before the end, it says, "In fairness to the defendant, however, it's noted that the indictment references his last act as occurring August 30, 1988. His actions had ended on that date. It could limit the guidelines of those effective November 1, 1987. This would release [sic] the total offense level as will be reflected below."
 
 
 23
 Is it your understanding the probation officer then did reduce the level?
 
 
 24
 DEFENSE COUNSEL: That is correct, your Honor. If we go on to 53 he is giving 13 points.
 
 
 25
 COURT: Yes.
 
 
 26
 Verdugo's counsel misspoke when he informed the court that the probation officer had reduced Verdugo's offense level. The "13 points" to which he referred were the Specific Offense Characteristics points added to Verdugo's Base Offense Level of 6. However, those additional 13 points are based on the 1992 Guidelines; under the 1987 Guidelines, Verdugo would have received only 11 additional points.
 
 
 27
 Under the 1992 Guidelines, Verdugo's Adjusted Offense Level was 21. Under the 1987 Guidelines, his Adjusted Offense Level would have been 19. Because the district court gave Verdugo a three-point reduction for acceptance of responsibility, it sentenced him based on an offense level of 18, which carries with it a term of 27 to 33 months. If the court had intended to sentence Verdugo based on the 1987 Guidelines--a point that simply cannot be determined from the transcript of the sentencing hearing--Verdugo's offense level would have been 16, which carries with it a term of 21 to 27 months.
 
 
 28
 The district court clearly expressed its intent to sentence Verdugo to the absolute minimum period of incarceration permitted by the Guidelines. If the court had applied the 1987 Guidelines (which it incorrectly may have thought it was doing), Verdugo's sentence would have been six months shorter.
 
 
 29
 The Government counters Verdugo's argument by identifying evidence adduced at trial that suggests that Verdugo's participation in the conspiracy continued into 1990. If Verdugo did in fact participate in the conspiracy as late as 1990, the more recent version of the Guidelines would apply and Verdugo's 27 month sentence would be appropriate.
 
 
 30
 The record simply does not reflect, however, whether the court found that Verdugo's participation continued until 1990, or whether it ended earlier. The court quite possibly believed that it was sentencing Verdugo to the minimum period of incarceration under the 1987 Guidelines. If so, it was in error. Because the record requires clarification on this point, we remand the matter to the district court for further proceedings on Verdugo's sentencing. See, e.g., United States v. Licciardi, 30 F.3d 1127, 1134 (9th Cir.1994) (remanding case for resentencing because of trial court's confusion on a relevant issue).
 
 B. Refusal to Downward Depart
 
 31
 Verdugo argues that the district court incorrectly believed that it could not grant a downward departure for his rehabilitation from alcohol. This belief, however, was not incorrect. This Court held in United States v. Martin that "a defendant's post-arrest drug rehabilitation efforts afford no basis for downward departure from the guideline sentencing range." 938 F.2d 162, 164 (9th Cir.1991), cert. denied, 503 U.S. 988 (1992). Although Verdugo began his rehabilitation prior to his arrest, the court in Martin, after considering policy statements by the Sentencing Commission, adopted the general proposition that "dependence upon drugs, or separation from such a dependency, is not a proper basis for a downward departure from the guidelines." Id. (quoting United States v. Pharr, 916 F.2d 129, 133 (3d Cir.1990), cert. denied, 500 U.S. 959 (1991)). Accordingly, Verdugo's argument fails.
 
 C. Amount of Loss
 
 32
 Verdugo next argues that the district court erred in accepting the Presentence Report's conclusion that the Government lost $2.6 million in duties as a result of the conspiracy. According to Verdugo, the record is unclear whether $2.6 million was the amount of the actual duties lost or whether, as he claims, that figure represented the total value of the goods upon which duties should have been imposed, resulting in lost duties of approximately $500,000.
 
 
 33
 The district court made the following finding at Verdugo's sentencing hearing: "I'm going to accept the fact that you were involved in this, having heard the entirety of this matter during trial, to the amount of 2.6 million." This Court reviews findings of fact underlying the district court's sentencing decision for clear error. United States v. Chapnick, 963 F.2d 224, 226 (9th Cir.1992).
 
 
 34
 A customs analyst testified at trial the she calculated lost duties at approximately $2.67 million. The district court's finding is therefore supported by evidence in the record and is not clearly erroneous. See Service Employees Int'l Union v. Fair Political Practices, 955 F.2d 1312, 1317 n. 7 (9th Cir.), cert. denied, 112 S.Ct. 3056 and 3057 (1992) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").
 
 
 35
 D. Verdugo's Responsibility for the Total Loss
 
 
 36
 The Presentence Report states that the conspiracy commenced in 1986, that Verdugo entered the conspiracy in 1988, and that it continued until at least January 1991. The Report does not indicate when, or if, Verdugo left the conspiracy, although it does identify only two overt acts in which he was involved, both occurring in August 1988.
 
 
 37
 As noted above, the district court concluded that Verdugo was "involved ... to the amount of 2.6 million." The court continued: "I know that the Circuit is wrestling with ways of splitting out co-conspirators in terms of total amount of responsibility. But it appears to be of no help in this case."
 
 
 38
 Verdugo argues on appeal that the district court in fact should have "split out" his share of responsibility for the total loss incurred in this case and that it should have given him a sentence more appropriate to his limited role. Specifically, Verdugo argues that he cannot be held responsible for the conspiracy before he joined it or after he left it, and that the district court therefore must make "a specific finding ... as to the amount of loss ascribable to [him]."
 
 
 39
 Verdugo cannot succeed on this argument. Pursuant to U.S.S.G. Sec. 1B1.3(a)(1)(B), the amount of loss attributable to a conspiracy defendant includes the loss caused by his own acts and the loss stemming from acts of others that were "reasonably foreseeable" by him and were committed in furtherance of the conspiracy. See United States v. Petty, 992 F.2d 887, 890 (9th Cir.1993). Although losses incurred before Verdugo joined the conspiracy would not be attributable to him, see id. at 891, the record reflects that the $2.6 million figure is derived from conduct occurring after 1988, which postdates Verdugo's entrance into the conspiracy.
 
 
 40
 Although Verdugo's direct involvement may have ceased in 1988, the district court's statement, "I'm also going to accept the fact that you were involved in this ... to the amount of $2.6 million," indicated that it had made a finding that Verdugo could have reasonably foreseen that his co-conspirators would engage in the activities that led to the post-1988 losses. Because this finding was not clearly erroneous, the district court was entitled to consider the full $2.6 million loss in sentencing Verdugo.
 
 E. Minor or minimal participant
 
 41
 Verdugo requested a downward adjustment pursuant to U.S.S.G. Sec. 3B1.2 as a minimal or minor participant. The district court denied that request, finding that Verdugo's role in the offense was not minimal.
 
 
 42
 Whether a defendant is a minimal or minor participant is a factual determination subject to the clearly erroneous standard of review. See United States v. Lui, 941 F.2d 844, 848 (9th Cir.1991). Because a ruling on a downward adjustment is highly fact specific, see United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir.1990), appellate courts give great deference to the district court's action. United States v. Cassiere, 4 F.3d 1006 (1st Cir.1993).
 
 
 43
 The court noted at Verdugo's sentencing that "the conspiracy could not have taken place in the manner that it did without [Verdugo's] active participation, at least initially." The court continued, "And it may be that others then used you without your knowledge even. But if you had not given them the okay, even though under the influence of alcohol initially, we could not have had this type of conspiracy."
 
 
 44
 Given Verdugo's critical role as the customs official with the authority to approve the import documentation, the district court was correct in concluding that the conspiracy could not have occurred in the manner in which it did without Verdugo's participation. The court's finding was not clearly erroneous, and Verdugo's argument therefore fails.
 
 CONCLUSION
 
 45
 Verdugo's argument that the district court may have inadvertently applied the 1992 version of the Sentencing Guidelines is supported by the transcript of the sentencing hearing. Given that the court indicated its intent to give Verdugo the shortest sentence possible, if the district court did in fact intend to apply the 1987 Guidelines, Verdugo would be entitled to a six-month reduction in his sentence. Accordingly, we remand the matter to the district court for clarification of this matter. The other arguments raised by Verdugo on appeal are without merit.
 
 
 46
 For the foregoing reasons, the district court's rulings on the motions to dismiss and recuse are AFFIRMED and Verdugo's sentence is REVERSED and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication, and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Other defendants were Edward Talamantes, Jr., a former customs inspector and vice-president of Le Chois, Inc.; Martin Alan Feldman, the owner of Le Chois, Inc. and Esni, Inc.; and Howard Regen, a Le Chois vice-president
 
 
 [2]
 The Presentence Report notes that the 1989 Guidelines, rather than the 1992 Guidelines, technically would apply if Verdugo's actions continued into 1990. However, because the sentencing result is the same under both the 1989 and 1992 Guidelines, the Sentencing Report uses the 1992 Guidelines